IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:03-cr-00296 |
| | ) | |
| SEIFULLAH CHAPMAN | ) | |

Government's Opposition to Motion for
Early Termination of Supervised Release

After a bench trial in 2004, this Court convicted Seifullah Chapman of conspiring to

provide material support to the terrorist organization known as Lashkar-e-Taiba ("LET"),

knowing or intending that his support would be used in furtherance of a conspiracy to kill or

injure persons or damage property in a foreign country, in violation of 18 U.S.C. §§ 956 and

2339A.  This Court also convicted Chapman of conspiring to organize a military expedition

against countries with whom the United States was at peace, in violation of 18 U.S.C. §§ 371 and

960 (the Neutrality Act), as well as related firearms offenses.

The material support charge triggered the application of a 30-year Guidelines sentence,

and two of the firearms offenses carried mandatory terms of lengthy imprisonment.

Accordingly, in June 2004, this Court sentenced Chapman to 1,020 months in prison, including a

360-month Guidelines sentence for the material support and Neutrality Act conspiracies, and a

consecutive 660 months for the firearms charges.  The Court also sentenced Chapman to three

years of supervised release on each count of conviction, to be served concurrently.  In light of the

total sentence to imprisonment of 1,020 months, the length of the appropriate term of supervised release seemed at the time to be a moot point.

When the case was remanded to comply with *United States v. Booker*, 543 U.S. 220 (2005), this Court reduced Chapman's sentence on the material support and Neutrality Act charges from 360 months to 120 months, but the sentence for the firearms charges remained at 660 months.  In light of the new sentence of 780 months, the length of the appropriate term of supervised release still seemed to be a moot point.

On July 19, 2018, after the issuance of *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), this Court vacated Chapman's convictions on the firearms charges that carried the stiff mandatory terms of imprisonment.  *Chapman v. United States*, 326 F. Supp. 3d 228 (E.D. Va. 2018). Chapman was thereafter released from prison and, since that time, has been on supervised release.  Since his release, Chapman has served approximately 16 months of his 36-month term of supervised release.

Now, approximately 20 months prior to its expiration, Chapman moves this Court to terminate his supervised release.  His motion should be denied because he cannot demonstrate that early termination of his supervised release is in the interest of justice.

Argument

Under 18 U.S.C. § 3583(e)(1), a sentencing court may terminate a term of supervised release prior to its expiration.  To obtain such relief, the defendant must have served one year of supervised release and the sentencing court must determine that "such action is warranted by the conduct of the defendant released ***and the interest of justice***." 18 U.S.C. § 3583(e)(1) (emphasis

added).  *See* Fed. R. Crim. P. 32.1(c) (establishing procedures pursuant to which sentencing court may modify the conditions of defendant's supervised release).

A.      Good Behavior is Not Sufficient to Merit Early Termination

"Congress has manifested an intent to require full service of supervised release for rehabilitative purposes."  *United States v. Bowe*, 309 F.3d 234, 240 (4th Cir. 2002).  "The language of the statute notes that the district court 'may' terminate supervised release if it is satisfied that such action is warranted by the conduct of the defendant released *and the interest of justice*."  *United States v. Pregent*, 190 F.3d 279, 283 (4th Cir. 1999) (emphasis in original).[1] Thus, in considering a motion under § 3583(e)(1), courts "must conclude that the early termination of supervised release is warranted both by the individual's conduct *and also* by the interest of justice."  *Id*. (emphasis added).  In considering whether early termination is in the interest of justice, courts are given latitude to consider factors other than the individual's behavior.  *Id*.

As a primary matter, Chapman's motion's near-exclusive focus on his good behavior while on supervised release cannot be a basis for early termination.[2]  "Model prison conduct and full compliance with the terms of supervised release is what is expected of a person under the

---

[1] Internal citations and quotations are omitted throughout this pleading.

[2] We have no reason to question Chapman's post-release behavior, but the rosy portrayal of his conduct in prison is exaggerated.  For example, Chapman's own exhibit states that he was "uncooperative and belligerent" during the investigation of one of his prison infractions.  Dkt. 943-5 at 5.

magnifying glass of supervised release and does not warrant early termination[;] . . . if full compliance was a sufficient reason to terminate supervised release, the exception would swallow the rule." *United States v. Taylor*, No. 3:08CR047, 2011 WL 1167212, at *2 (E.D. Va. Mar. 24, 2011) (Payne, J.).

Numerous courts have held similarly. *See, e.g.*, *United States v. Longerbeam*, 199 F. Supp. 3d 1, 2 (D.D.C. 2016) ("even perfect compliance with conditions of release does not qualify as 'exceptionally good behavior' warranting early termination"); *United States v. McKay*, 352 F. Supp. 2d 359, 361 (E.D.N.Y. 2005) ("While McKay's behavior in prison and on supervised release is laudable, it is not so unusual as to merit early termination"); *United States v. Weintraub*, 371 F.Supp.2d 164, 167 (D.Conn. 2005) ("[a]lthough [the defendant's] ongoing and full compliance with all conditions of supervised release . . . is commendable, in the end that is what is required to all criminal defendants and is not a basis for early termination of his supervised release"); *United States v. Caruso*, 241 F.Supp.2d 466, 469 (D.N.J. 2003) ("mere compliance with the terms of probation or supervised release is what is expected of probationers, and without more, is insufficient to justify early termination"); *United States v. Medina*, 17 F.Supp.2d 245, 247 (S.D.N.Y.1998) ("Unblemished conduct while under supervision . . . cannot be sufficient reason to terminate [supervision] since, if it were, the exception would swallow the rule"). To obtain the relief he seeks, therefore, Chapman must show more than just adherence to the terms of his supervision.

B.    "Over-Service" of a Sentence of Incarceration is Not a Basis for Early Termination

Chapman argues that "[i]t is in the interest of justice to terminate his supervised release early[]" because he overserved his sentence by five years. Mot. at 5; *see also* Mot. at 2. His

argument is squarely at odds with the Supreme Court's decision in *United States v. Johnson*, 529 U.S. 53 (2000). There, the Supreme Court considered whether a defendant was entitled to a reduction in the term of his supervised release to compensate him for overserving his sentence due to vacated convictions.

In holding that he was not, *Johnson* noted that "[s]upervised release fulfills rehabilitative ends, distinct from those served by incarceration" and that "[t]he objectives of supervised release would be unfulfilled if excess prison time were to offset and reduce terms of supervised release." *Id*. at 59. For those reasons, the Supreme Court held that 18 U.S.C. § 3624(e), the relevant statutory authority, did not entitle the defendant to credit based on over-service of an original term of imprisonment. In short, *Johnson* held that § 3624(e) "does not reduce the length of a supervised release term by reason of excess time served in prison." *Id*. at 60.

Supervised release "is not a punishment in lieu of incarceration." *United States v. Buchanan*, 638 F.3d 448, 451 (4th Cir. 2011). Instead, supervised release "after incarceration is to improve the odds of a successful transition from the prison to liberty," *id.*, and "it is hard to imagine the way in which supervision would aid in a person's transition if he could serve his entire term of supervised release before leaving prison." *United States v. Neuhauser*, 745 F.3d 125, 129 (4th Cir. 2014).

As such, Chapman's proposal that this Court consider his overserved sentence in terminating his supervised release should be rejected. As the Fourth Circuit has recognized, the Supreme Court has squarely ruled that a defendant is not entitled to offset an excess term of imprisonment with a shortened term of supervised release:

> The Supreme Court has rejected the argument that a defendant is entitled to offset an excess term of imprisonment with a shortened term of supervised release. As the Supreme Court explained, the "objectives of supervised release would be unfulfilled if excess prison time were to offset and reduce terms of supervised release. Congress intended supervised release to assist individuals in their transition to community life. Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59, 120 S.Ct. 1114, 146 L.Ed.2d 39 (2000).

*United States v. Lowery*, 551 F. App'x 688, 690 (4th Cir. 2014); *accord United States v. Abdullah*, 666 F. App'x 304, 306 (4th Cir. 2016) ("it is not possible to consider the initial term of imprisonment to fulfill at least a portion of the supervised release term").

### C.   Chapman's Medical Condition Is Not a Reason to Terminate Supervised Release

Chapman devotes substantial attention in his motion to describing the various hardships he experienced while incarcerated, specifically as related to his medical condition.  The conditions of his supervised release, however, do not prevent him from obtaining appropriate treatment.  As Chapman himself concedes, he can secure the appropriate permissions from his Probation Officer to see his doctors.  Mot. at 17.  Accordingly, terminating supervised release entirely on this ground is unwarranted, especially when Chapman has never moved this Court simply to modify the terms of his supervision.

### D.   Whether Chapman's Conduct Constituted "Crimes of Violence" for Purposes of § 924(c) is Not Determinative of the Seriousness of His Criminal Conduct

Chapman also argues that early termination of supervision is warranted because his "convictions were for non-violent conduct that did not result in harm to the person or property of another[.]"  Mot. at 5.  To this end, Chapman seizes on this Court's statements in *Chapman v. United States*, 326 F. Supp. 3d 228 (E.D. Va. 2018), that his crimes were no longer "crimes of

violence" for purposes of 18 U.S.C. § 924(c).  While it is true that, after *Dimaya*, this Court vacated three of Chapman's convictions as no longer predicated on "crimes of violence" for purposes of that section, that hardly renders Chapman's underlying conduct less serious for purposes of considering the termination of supervised release.

As is well known, the categorical approach is an "Alice in Wonderland path," *United States v. Battle*, 927 F.3d 160, 163 n.2 (4th Cir. 2019), requiring courts to "counterintuitively ignore whether the defendant's actual conduct involved [] a use of force." *United States v. Allred*, __F.3d__, No. 18-6843, 2019 WL 5792489, at *3 (4th Cir. Nov. 7, 2019). There is no such requirement for supervised release however.  Indeed, the conduct which formed the basis for the predicate acts under Counts 11, 20, and 22 remains the same, notwithstanding those counts' *vacatur*.  Moreover, even if that were not true, whether or not Chapman's offenses were "crimes of violence" is not the *sine qua non* of their seriousness.

In any event, Chapman omits a critical line from this Court's decision.  Although this Court held that Counts 1 and 5 were not "crimes of violence" for purposes of § 924(c), it still noted that Chapman's "various activities occurred at the periphery of—and, in some cases, *with the intent to support—violent actions undertaken by others, including co-conspirators and LET members*[.]" *Chapman*, 326 F. Supp. 3d at 248 (emphasis added).  In considering an appropriate sentence or period of supervised release, there is no significant difference between a "crime of violence" for purposes of § 924(c), and criminal activity undertaken with the intent to support violent acts.

Indeed, numerous crimes – easily considered among the most serious – have been deemed not "crimes of violence" under the categorical approach. *See, e.g.*, *United States v.*

7

*Walker*, 934 F.3d 375 (4th Cir. 2019) (federal kidnapping is not a "crime of violence"); *United States v. McCollum*, 885 F.3d 300 (4th Cir. 2018) (conspiracy to commit murder in aid of racketeering is not a "crime of violence"); *United States v. Parral-Dominguez*, 794 F.3d 440 (4th Cir. 2015) (North Carolina conviction for knowingly discharging a firearm into an occupied building is not a "crime of violence"); *United States v. Shell*, 789 F.3d 335 (4th Cir. 2015) (North Carolina conviction for rape of a mentally disabled person is not a "crime of violence"); *United States v. Torres–Miguel*, 701 F.3d 165 (4th Cir. 2012) (California conviction for threatening to commit a crime "which will result in death or great bodily injury to another" is not a "crime of violence"); *see also United States v. Doctor*, 842 F.3d 306, 315 (4th Cir. 2016) (Wilkinson, J., concurring) (citing cases).

> E.    In Light of the True Nature of Chapman's Offenses, Termination
>        of Supervised Release Would Undermine the Interests of Justice

All of this is to say that Chapman's attempt to diminish and minimize the conduct which formed the basis of his convictions is misplaced.  As this Court found (and as supplemented by evidence admitted at trial):

- Before 9/11, Chapman was avidly interested in violent jihad.  He led jihad training for his friends.  *United States v. Khan,* 309 F.Supp.2d 789, 805 (E.D. Va. 2004).  He sent from his work e-mail account to his home account an article titled, ''Martyrs: The Building Blocks of Nations,'' which stated, ''History does not write its lines except with blood." *Id. at* 817.[3]

- As proclaimed before 9/11 through its website and its electronic newsletter known as the Taiba Bulletin (edited at the time by Chapman's friend Royer),

---

[3]  In its opinion, this Court cited to G Ex 4G3.  According to that exhibit, the remainder of the quote from the email is "Glory does not build its loft edifice except with skulls.  Honor and respect cannot be established except on a foundation of cripples and corpses."

the terrorist organization LET engaged in many violent actions against Indian military and government officials. *Khan,* 461 F.3d at 483. Even before 9/11, its leader exhorted the mujahideen to kill Jews in their homes, G Ex 1D27; *Khan,* 309 F.Supp.2d at 807; and bragged that mujahideen would destroy Western Civilization. G Ex 1D29. Trial evidence showed that, in April 2000, ABC News broadcasted from an LET camp, reporting, "On a wall surrounding the camp, we noticed this graffiti: 'Yesterday we broke the Soviets. Tomorrow we break America,'" and filmed the writing across a wall of the camp. G Ex 7F3. In a story on LET in October 2000, the New York Times displayed an LET graphic showing a burning American flag, with the admonition to "destroy the non-believers." G Ex 7F9a; *Khan,* 309 F.Supp.2d at 817. Posters with similar graphics were openly displayed at LET facilities. *Khan,* 309 F.Supp.2d at 808.

- Before 9/11, Chapman conspired to organize expeditions to join LET attacks on India. In the course of that conspiracy, he signed false documents concerning the transfer and sale of AK-47 firearms that he helped co-conspirators obtain, which weapons were chosen because they were similar to the weapons used by mujahideen overseas. *Khan,* 309 F.Supp.2d at 818-19.

- In 2000 and 2001, Chapman learned of the experiences that Royer and Hamdi had while attending LET camps. He decided to attend the LET camps as well, and used Royer's contacts to make arrangements to do so. *Id.* at 808.

- In August 2011, Chapman traveled to an LET training camp in Pakistan, and spent approximately one month there, participating in weapons training and military drills. *Id.* at 808-09.

- After returning to the United States, and after Chapman knew that LET was designated a terrorist organization by the United States, Chapman helped an LET operative procure parts for LET's military use of unmanned aerial vehicles for attacks against India. *Id.* at 811-14, 822.

- At trial in 2004, Chapman claimed that he went to the LET camps in 2001 "for the scenery, outdoor activities, and low cost, without checking the LET Website before traveling halfway around the world." *Id.* at 817. He claimed that he knew nothing about LET's violent mission. *Id.* This Court described his testimony as "incredible," "implausible," "inherently incredible" and "utterly implausible." *Id.* at 809, 816-17.

In short, this Court found that Chapman supported terrorists who adhered to an ideology

of violence against those they perceived to be enemies of Islam. This Court further found that,

before 9/11, Chapman traveled half-way around the world to train with terrorists who - - in their

own words - - proclaimed their mission was to "kill Jews in their homes" and destroy Western

civilization.  This Court further found that, even after 9/11, and after LET attacked the Indian

Parliament while it was in session, and after he knew that LET was a designated terrorist

organization, Chapman helped LET acquire parts for militarized drones.  Finally, this Court

found that Chapman repeatedly lied during his testimony at trial.

Nothing about this Court's *vacatur* of Chapman's firearms offense diminishes the

seriousness of his criminal conduct.  Putting aside entirely the firearms charges, this conduct,

alone, is sufficiently serious to warrant a term of supervised release far longer than three years.

Perhaps Chapman no longer adheres to the same ideology that he did when he attended

the LET camps, or at least, no longer seeks to act in furtherance of it -- but perhaps he still does.

Perhaps he will refuse to assist LET in the event he is, in the future, again approached to help the

organization - - but perhaps he won't.  Either way, past experience indicates that his word is not

one upon which we can safely rely.[4]

In cases of this type, this Court typically imposes substantially longer terms of

supervision.[5]  We suspect that, at the times the sentences were imposed on Chapman in 2004 and

---

[4]  Absent from the reasons Chapman provides for early termination of supervised release is
any indication that, even today, he accepts responsibility for lying during his testimony before
this Court - - much less for supporting terrorists that yearned to destroy his country.

[5]  *See, e.g.*, *United States v. Ferizi*, No. 16-cr-00042 (LMB) (E.D. Va.) (20 years); *United
States v. Qamar*, No. 1:16-cr-00227 (LMB) (E.D. Va.) (20 years); *United States v. Young*, No.
1:16-cr-00265 (LMB) (E.D. Va.) (15 years).

10

2005, no one foresaw that the length of the terms of supervised release might someday be anything other than moot.  Indeed, had the Court foreseen that the sentence to incarceration would be cut by decades, it might have imposed a longer term of supervised release.  In any event, the course of events that actually transpired is not one to indicate that his supervised release should be terminated early.

For these reasons, and specifically given the seriousness of his offenses, the interests of justice do not counsel in favor of prematurely terminating Chapman's supervision.

Conclusion

For the reasons set forth above, the Court should deny Chapman's motion.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: _____/s/_____
Gordon D. Kromberg
Assistant United States Attorney
Joseph Attias
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Gordon.Kromberg@usdoj.gov

11

<u>Certificate of Service</u>

I certify that on November 20, 2019, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.


By: _____/s/_____
Gordon D. Kromberg
Assistant United States Attorney